## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**CRIMINAL ACTION**

**VERSUS**

**NO. 16-26-JWD-RLB-1**

**FRANK DEMOUCHET**

### RULING AND ORDER

### I.      INTRODUCTION

Before the Court is the Motion to Suppress ("Motion to Suppress"), (Doc. 30) filed by Mr. Frank Demouchet ("Defendant"), and further supported by his Post-Hearing Memorandum in Support ("Defendant's Memorandum"), (Doc. 57). The United States has filed an Opposition to the Motion to Suppress ("Government's Opposition"), (Doc. 33), and a Post-hearing Memorandum in Opposition ("Government's Memorandum") (Doc. 56). Additionally, the parties submitted replies to the post-hearing memoranda ("Defendant's Reply" and "Government's Reply", respectively) (Docs. 58 & 59). The Court heard oral argument on September 14, 2016 ("the First Hearing") (Doc. 46), which was continued on September 30, 2016 ("the Second Hearing") (Doc. 49). After careful consideration of the parties' arguments, for the reasons set forth herein, Defendant's **Motion to Suppress** is **DENIED**.

### II.     FACTUAL BACKGROUND

Starting in November 2015, based on information provided by a confidential informant that Defendant was distributing methamphetamine in the Denham Springs area, detectives with the Livingston Parish Sheriff's Office ("LPSO") launched an investigation that resulted in Defendant's February 2016 arrest. (Doc. 46 at 6.) According to LPSO Narcotics Detective Steve Erdey, around November 2015, LPSO received several anonymous telephone calls and tips that a black male

1

known as "J" was distributing methamphetamine in a black Audi vehicle.[1] (Doc. 46 at 6—7.) One such tip provided detectives with a license plate that was registered to Defendant. Additionally, LPSO detectives received an anonymous Crime Stopper's tip that corroborated this information and also provided detectives with a possible residence at which Defendant was living.[2] (Doc. 46 at 7.) The Crime Stopper's tip indicated the tipster was providing secondhand information, and did not reveal the original source of the information. (Doc. 46 at 35; Gov. Ex. 2; Def. Ex. B.)

Based on this information, Detective Erdey began an investigation into Defendant; he ran Defendant's criminal history, ascertained his date of birth, and attempted to locate his current residence. (Doc. 46 at 9.) Although detectives identified several addresses associated with Defendant, he no longer resided at those locations; it was not until after LPSO received the Crime Stopper's tip that detectives learned Defendant was residing at the Juban Lakes Apartments on Buddy Ellis Road. (Doc. 46 at 10.) At that time, Detective Erdey began conducting surveillance on the Juban Lakes apartment complex and observed Defendant exit Apartment 128 on several occasions. (Doc. 46 at 10.) Detective Erdey also observed several individuals, mainly females, enter and exit Apartment 128. (Doc. 46 at 10.) The apartment complex is a gated community and Defendant's apartment was located on the second floor. (Docs. 1 at 2; 46 at 13.) Detective Erdey testified that traffic in and out of the apartment slowed somewhat during the holidays, and further stated he believed a maintenance man who worked for the apartment complex and who lived in the apartment below Defendant informed Defendant that authorities were watching him. (Doc. 46 at 10, 23.)

---

[1] Although LPSO received several phone calls, Detective Erdey could not state with certainty how many individuals called; he stated that there was at least one male and one female caller, and possibly more. (Doc. 46 at 8.)

[2] The Crime Stopper's tip was provided to LPSO through an independent agency. The information provided by the caller was documented on paper by the agency and forwarded to the investigating officials. This document is the only evidence of the Crime Stopper's tip. (Doc. 46 at 7.)

On or about February 12, 2016, the confidential informant who previously provided detectives with information about Defendant contacted Detective Erdey to inform him that Defendant had resumed his pattern of regularly distributing drugs, and that within the last seventy-two hours, the informant had observed a large amount of methamphetamine in Defendant's home. (Docs. 1 at 2; 46 at 11.) According to Detective Erdey, the informant had previously provided information to LPSO that has resulted in arrests in other narcotics cases, and he considers the informant reliable and credible. (Doc. 1 at 2-3.)

On February 13, 2016, Det. Erdey conducted surveillance of Defendant's apartment and observed Defendant exit Apartment 128. (Doc. 1 at 3.) On February 14, 2016, based on the information LPSO had gathered on Defendant, including the most recent tip from the confidential informant, Det. Erdey applied for, and obtained, a search warrant for Defendant's residence. (Doc. 1 at 3.) In his application for the search warrant, Detective Erdey stated, in relevant part:

> The complaints on Demouchet ranged from anonymous citizens calling in[] to Crime Stoppers tips. All the information received from the public is consistent, stating that Demouchet drives a black Audi A5 2-door car bearing Louisiana license plate ZEZ258, and that he owns other vehicles which he sometimes stores narcotics in. It was said that Demouchet mainly uses his Audi A5 to transport the narcotics from one location to another.
>
> …
>
> Within the last 72 hours, your affiant received information from a proven-reliable, confidential informant (CI) that Demouchet has been selling meth from within the above mentioned residence. The CI has seen a large quantity of meth inside the residence in the past 72 hours. The CI has also observed scales and packaging materials consistent with distribution of meth.
>
> It should be noted that the CI has assisted law enforcement during investigations in the past which have led to felony arrests and the seizures of methamphetamine. The CI can readily identify meth and is familiar with the current methods used to distribute methamphetamine.
>
> A records check of law enforcement data bases revealed that Demouchet has a **4-door 1993 Honda Accord (YTB 572), silver in color, and a 2-door 2010 Audi A5 (ZEZ258) black in color**, registered to him. He is also known to be driving a newer Ford car which does not have a license plate on it. Demouchet also has several narcotics related arrests as well as an arrest for second (2nd) Degree Murder in 2012.

> Being that the 1993 Honda Accord and 2010 Audi are suspected to be used in the trafficking and storage of narcotics, your affiant request[s] that the vehicles be searched as well. Also, your Affiant request[s] that any out building, shed or garage affiliated with Apt. 128 be subject to search.

(Gov. Ex. 3; Def. Ex. A (emphasis original).)

Judge Robert Morrison of the 21st Judicial District Court ("21st JDC") signed the warrant on February 14, 2016. (Doc. 1 at 3; Gov. Ex. 3; Def. Ex. A.) The application for the warrant was submitted electronically. (Doc. 30-2 at 2.) The search warrant authorized a search of "11000 Buddy Ellis Rd Building-1, Apt. 128, Denham Springs, LA 70726" for "[a]ny and all controlled dangerous substances, to include but not [be] limited to Schedule II CDS Meth" as well as "[a]ny article used to facilitate the consumption, distribution, trafficking, and/or manufacture of any controlled dangerous substance, e/g…. vehicles[.]" (Gov. Ex. 3; Def. Ex. A.) The warrant further states "…I am satisfied from the affidavit(s) submitted… that there is probable cause to believe that the aforesaid property is being concealed on or in the vehicles listed in the search warrant above described[.]"(Gov. Ex. 3; Def. Ex. A.) The warrant authorized detectives "to search forthwith the aforesaid vehicles listed in the search warrant for the property specified… to search ' all persons' found at or inside the residence, cartilage [sic], and inside any vehicles." (Gov. Ex. 3; Def. Ex. A.)

On February 19, 2016, in preparation for the execution of the search warrant, Detective Erdey and his partner Detective Gray conducted surveillance in the parking lot located at 11000 Buddy Ellis Road, near Building 1. (Docs. 1 at 3; 46 at 14, 16.) At approximately 9:00 am, the detectives observed Defendant and two other men descend the staircase of Building 1 (presumably from within Apartment 128) and walk toward a black Ford Taurus in the parking lot. (Docs. 1 at 3; 46 at 15—16.) Defendant was carrying a shoulder bag. Detective Erdey observed Defendant as he

4

> opened the car door… went to the trunk with a tan leather book sack, opened the trunk, put the book sack back in… he [then took] a cellophane wrapped package out of the tan book sack, pull[ed] the carpet from the trunk of the car, reach[ed] his hand in way up in the car, put[] the package in the car, come[] back out, lay[] the carpet back down, take[] the bag and get[] into the vehicle.

(Doc. 46 at 16—17.)

Based on his experience, Detective Erdey determined Defendant's actions were consistent with drug trafficking and suspected there were narcotics wrapped inside the cellophane bag. (Doc. 46 at 17.) When the three men began to drive away in the vehicle, Detective Gray approached in an unmarked car and blocked Defendant's car so he could not leave the parking lot. (Doc. 46 at 20.) Detectives Erdey and Gray proceeded to remove the three men from inside the vehicle without incident. (Docs. 1 at 3; 46 at 20.) As the detectives were handcuffing the occupants of the vehicle, they smelled a strong odor of marijuana emanating from inside the vehicle and its occupants. (Doc. 46 at 20.) Detective Erdey advised Defendant of his *Miranda* rights, and then questioned him about the odor emanating from the car. (Doc. 46 at 20.) Defendant advised Detective Erdey that they smoked marijuana in the vehicle recently, but they no longer had any in their possession. (Doc. 46 at 20.)

A search of the vehicle revealed approximately one-half pound of marijuana and approximately $7,000 hidden inside a secret compartment inside the rear driver's side fender well. (Docs. 1 at 4; 46 at 21—22.) Detectives also found a receipt from the Dollar Store that reflected a debit card with the last four digits -8468 was used to purchase acetone and baking soda, cash, keys to a garage, and keys to the apartment complex. (Docs. 1 at 4; 46 at 22.) When Detective Erdey searched Defendant, he found a Regions Bank Debit Card with the last four digits of -8468. (Doc. 1 at 3—4.) Based on his experience in the field, Detective Erdey recognized acetone and baking soda as items used in the processing of cocaine. (Doc. 1 at 4.) Det. Erdey subsequently obtained

5

surveillance video from the Dollar Store depicting Defendant purchasing two bottles of acetone, baking soda, and other items. (Doc. 1 at 4.) Additionally, Detective Erdey, observed an electronic garage opener in Defendant's vehicle. (Doc. 1 at 5.)

Pursuant to the warrant, detectives executed a search of Defendant's home, which revealed approximately 450 grams of methamphetamine in a plastic container concealed underneath an air mattress in the southeast bedroom. (Doc. 1 at 4.) They also found a loaded Smith and Wesson 40 Caliber handgun hidden under the sofa cushions in the living room. (Doc. 1 at 4.)  Additionally, they found several items of mail bearing Defendant's name inside the apartment. (Doc. 1 at 4.) By this time, Detective Erdey's supervisor, Sergeant Denny Perkins, arrived on the scene and participated in the execution of the warrant. (Doc. 46 at 23.)

During the course of the search of the apartment, detectives learned that Defendant's lease agreement included the rental of a detached garage on the premises, specifically garage # 29. (Docs. 1 at 4; 46 at 23.) After learning Defendant's lease included the garage rental, Sergeant Perkins contacted the District Attorney for the 21st JDC to inquire whether they had authority to search the detached garage. (Doc. 46 at 25.) The District Attorney advised the officers that "if the verbiage was in the search warrant, then it would be covered under that about garages and out-buildings".[3] (Doc. 46 at 25.) Under the belief the warrant authorized a search of the garage, and with the assistance of the building's management, the detectives gained access to Defendant's garage, where they found approximately 504 grams of cocaine and approximately 896 grams of methamphetamine as well as various paraphernalia items, packaging materials, and materials to

---

[3] Although the affidavit, which was incorporated into the warrant by reference, specifically mentioned a search of a garage associated with Apartment 128, the search warrant itself did not explicitly reference a garage. (Gov. Ex. 3; Def. Ex. A.)

produce crack-cocaine. (Docs. 1 at 4—5; 46 at 25.) These items were located in plain sight in clear plastic containers. (Doc. 1 at 4.)  The garage was otherwise empty. (Doc. 1 at 5.)

After detectives discovered the narcotics in Defendant's apartment, garage, and vehicle, Detective Erdey re-Mirandized Defendant, and Defendant indicated he understood his rights. (Doc. 1 at 5.) Defendant then invoked his *Miranda* rights and was transported to the Livingston Parish Detention Center on state drug charges. (Doc. 1 at 5.)

## III.    DISCUSSION

Jurisprudence from the Supreme Court and the United States Court of Appeals is "clear and unequivocal: the Fourth Amendment requires that no warrant issue but upon probable cause, as determined by a neutral and detached magistrate." *United States v. Crane*, 759 F.2d 412, 426 (5th Cir. 1985) (*citing, e.g.*,*United States v. United States Dist. Court for the Eastern Dist. Of Mich.*, 407 U.S. 297, 316-18, 92 S.Ct. 2125 at 2136-37 (1972); *Chimel v. California*, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039 (1969)); *see also* U.S. CONST. amend. IV. To comply with this constitutional stricture, an affidavit supporting the application for a search warrant for a person's DNA "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317, 2332, 76 L.Ed. 2d 527 (1983); *see also, e.g.*, *United States v. Brown*, 567 Fed. Appx. 272, 282 (5th Cir. 2014) (quoting *Gates*); *United States v. Marion*, 547 Fed. Appx. 283, 285 (4th Cir. 2013) (same).

When a search warrant is not involved, even where a Fourth Amendment violation has occurred, the "exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits." *Utah v. Strieff*, 136 S.Ct. 2056, 2059 (2016).[4] Courts should resort to exclusion of

---

[4] *Strieff* is factually distinguishable from the instant case in that it dealt with an anonymous tip that an individual was dealing drugs from within his home. *Utah v. Strieff*, 136 S.Ct. 2056, 2059 (2016). Without a warrant, officers surveilled the home for several days, eventually stopping the defendant as he was leaving the suspected drug dealer's home. *Id.* at 2060. After detaining the defendant, the officer relayed his information to a police dispatcher, who informed him

evidence "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id.* at 2063. For an officer's conduct to be considered "flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Id.* at 2064 (*citing Kaupp*, 538 U.S. 626, 628, 633, 12. S.Ct. 1843, 1845, 1848 (2003)). In other words, a traffic stop based on something less than reasonable suspicion, without additional misconduct by the officer, will not give rise to the type of "flagrant" conduct that justifies exclusion of evidence found therein. *See id.*; *see also United States v. Levy*, 16-270, 2016 WL 6835539 at *10 (E.D.N.Y. Nov. 21, 2016) (applying *Strieff* to support denial of a motion to suppress methamphetamine seized during a traffic stop); *United States v. Ramos*, 15-3940, 2016 WL 4487923 at *20—*21, *35—*37 (D.N.M. July 11, 2016) (same).

### 1.  Constitutionality of La. Code Crim. Proc. Ann. Art. 162.2

#### a.  Parties' Arguments

Defendant argues the procedure by which Detective Erdey applied for the warrant—specifically that he submitted his application via electronic communications pursuant to La Code Crim. Pro. Ann. art. 162.2—violates Fed. R. Crim. Pro. 41 and invites this Court to declare Art. 162.2 unconstitutional. (Docs. 30-2 at 2; 57 at 3—5.) To that end, Defendant admits he has been unable to locate any caselaw in support of his position, but nonetheless asserts "comparing the text of [Art. 162.2] to the comparable federal rule suggests it is unconstitutional." (Doc. 30-2 at 2.)

---

the defendant had an outstanding arrest warrant for a traffic violation. *Id.* Based on the outstanding arrest warrant, the officer arrested the defendant and subsequently conducted a search incident to arrest, whereupon the officer discovered the defendant was in possession of methamphetamine and drug paraphernalia. *Id.* The parties agreed the officer had no reasonable suspicion to stop the defendant, and the issue before the Court was "how the attenuation doctrine applies where an unconstitutional detention leads to the discovery of a valid arrest warrant." *Id.* (citations omitted). The instant case differs in that the search of Defendant's Ford was *arguably* authorized by a facially valid search warrant, and the two issues before the Court are whether the search warrant encompassed the search of the Ford, and whether the good faith exception applies to bar the exclusionary rule to the evidence seized from the Ford. Nonetheless, the analysis in *Strieff* informs the Court's analysis in the instant case, as it delineates the instances in which application of the exclusionary rule is appropriate. *See generally*, *Strieff*, 136 S.Ct. at 2060-63.

Specifically, Defendant claims that under the federal rule, electronic warrants are permissible so long as the magistrate places the affiant under oath and is able to obtain additional testimony from the applicant as needed. (Doc. 30-2 at 2.) However, Defendant asserts Art. 162.2(D) jettisons "the formality of the oath" because the codal article "allows for the electronic submission – by itself— to serve as the equivalent of the Judge's administration of the oath." (Doc. 30-2 at 2.)

Additionally, Defendant claims that because Detective Erdey's warrant application and affidavit did not contain language that it "was made under penalty of perjury", it "completely neuters" the constitutional requirement that it be submitted under oath or affirmation. (Doc. 55 at 3.) Furthermore, Defendant criticizes the pro forma elements of the warrant application, noting that "there are large portions of the document, including the items to be searched, that are prefabricated and un-editable." (Doc. 55 at 4.) Based on the foregoing, Defendant submits that the LPSO's electronic application for a search warrant did not contain a valid "oath" under the Fourth Amendment, and thus the resulting search must be deemed unconstitutional.  (Doc. 30-2 at 2.)

The Government asserts Defendant's claim is "misguided and should be summarily dismissed." (Doc. 33 at 2 n.1.) It argues that to "pass constitutional muster" under federal jurisprudence, the Government must demonstrate that an impartial magistrate issued the warrant on the basis of a sworn affidavit that establishes probable cause. (Doc. 22 at 2 n.1 (citing *Crane v. Texas*, 759 F.2d 412, 426 (5th Cir. 1985)).) It alleges the warrant in the instant case "was issued by a magistrate on the basis of a sworn affidavit; the warrant, application, and affidavit each confirm the detective was sworn[,]" and is thus constitutionally valid. (Doc. 33 at 2 n.1.) Moreover, it argues reliance on the Federal Rules is misplaced in this case, as the Rule applies exclusively to federal authorities seeking warrants. (Doc. 33 at 2 n.1.)

The Government emphasizes that Defendant has not alleged "that the state judge who issued the warrant was not (1) impartial or (2) a judicial officer or magistrate." (Doc. 58 at 1.) It characterizes Defendant's grievances as "overly-ritualistic" and urges the Court to reject his argument that because Detective Erdey "did not literally stand before the judge and swear an oath to tell the truth", then the warrant must be invalid. (Doc. 58 at 2.) Citing jurisprudence from other circuit courts, the Government insists that this overly technical interpretation must be rejected, and maintains the procedure by which Detective Erdey obtained the warrant, which included the magistrate swearing in the detective over the telephone, is sufficient to satisfy the constitutional requirement. (Doc. 58 at 2 (citing *United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002); *United States v. Turner*, 558 F.2d 46, 50 (2d Cir. 1977).)

**b.  Analysis**

Defendant claims the provision of the Louisiana Code of Criminal Procedure authorizing the submission of an application for a search warrant via electronic means is unconstitutional. He alleges this procedure under La.C.Cr.P. art. 162.2 disposes of the "oath and affirmation" requirement in contravention of Federal Rule 41.  His reasoning is incorrect. First, Rule 41 unambiguously applies specifically to *federal* law enforcement officers, and does not encompass state law enforcement officers seeking a search or arrest warrant. *See* FED. R. CRIM. PRO. 41(a)(1)(C) & (b). Second, the plain language of Article 162.2 embodies a paragraph akin to the federal "oath and affirmation" requirement, and clearly states that by electronically signing the application, the applicant "swear[s] that the facts contained in the electronic testimony are true and correct to the best of his knowledge[.]"  Defendant has offered no jurisprudential support for his contention Art. 162.2 is unconstitutional as a general matter, or that it was unconstitutionally applied to him.

In any event, the Court notes that there has been no case analyzing the constitutionality of Article 162.2, despite the fact it is routinely used by Louisiana state magistrate judges. (*See* Doc. 53 at 6 (Detective Erdey testifying that every magistrate judge in Livingston Parish utilizes the procedure by which law enforcement officials can submit warrant applications electronically).) In *United States v. Brooks*, 285 F.3d 1102 (8th Cir. 2002), the defendant appealed the denial of his motion to suppress, claiming that the officer who applied for the search warrant which led to his arrest was not under oath at the time he submitted the warrant application and affidavit. *Brooks*, 285 F.3d at 1104—05. The officer began the affidavit by stating, "I, [officer], being duly sworn depose[] and state[] as follows", and the line preceding his signature read, "'I have read this affidavit and the facts herein are true to the best of my knowledge.'" *Id.* at 1104. At the suppression hearing, the officer testified that he did not recall "the notary having him raise his right hand and solemnly swear 'to tell the truth and nothing but the truth.'" *Id.* Accordingly, the defendant appealed his conviction, alleging the warrant upon which his arrest was predicated violated the oath and affirmation requirement of the Fourth Amendment. *Id.* On appeal, the Eighth Circuit affirmed and specifically stated:

> We reject [the defendant's] contention that the district court had no basis for concluding that [the officer] was under oath when he signed the warrant application and the supporting affidavit…. The language that [the officer] used in the documents, especially the repeated recitations that he was 'duly sworn,' quite obviously reflects his intention to be under oath. His conduct was also consistent with that intention… we conclude that there was sufficient evidence to support the district court's finding that [the officer] intended to be under oath.
>
> Almost all of the apposite cases indicate that this is the relevant inquiry *because a person who manifests an intention to be under oath is in fact under oath*…
>
> We also observe that [the officer's] evident state of mind when he signed the affidavit and application for a warrant ensured that the purpose of the [F]ourth [A]mendment's 'Oath or affirmation' requirement was fulfilled. An oath or affirmation 'is designed to ensure that the truth will be told by insuring that the witness or affiant will be impressed with the solemnity and importance of his words. The theory is that those who have been impressed with the moral, religious

or legal significance of formally undertaking to tell the truth are more likely to do so than those who have not made such an undertaking or been so impressed.' We believe that the circumstances that caused [the officer] to believe that he was signing under oath would also have impressed upon him the 'importance of his words.'

*Id.* at 1105—06 (internal citations omitted)(emphasis added); *see also United States v. Bueno-Vargas*, 383 F.3d 1104, 1110 (9th Cir. 2004) ("The question whether a statement is made under oath or affirmation turns on whether the declarant expressed the fact that he or she is impressed with the solemnity and importance of his or her words and of the promise to be truthful, in moral, religious, or legal terms."); *United States v. Mensah*, 737 F.3d 789, 807 (1st Cir. 2013) (same, quoting *Vargas*).

In this case, the warrant application, similar the warrant application in *Brooks*, begins: "**BEFORE ME**… Detective Steven Erdey… **WHO**, after being duly sworn by me, did depose and say…" and concludes it was "[s]worn and subscribed before me, this 14 day of February, 2016…" (Gov. Ex. 3; Def. Ex. A.) Detective Erdey's signature is found at the end of the affidavit. (Gov. Ex. 3; Def. Ex. A.) Thus, it is evident that Detective Erdey was "impressed with the solemnity and importance of his [ ] words and of the promise to be truthful, in… legal terms." *See Bueno-Vargas*, 383 F.3d at 1110. From Detective Erdey's testimony, it is clear that in his mind that an electronic search warrant carries with it the same weight and imposes the same responsibilities upon the affiant officer that a paper warrant application. (*See* Doc. 53 at 25—26.) Moreover, unlike in *Brooks*, here, the magistrate judge did, in fact, swear Detective Erdey in over the telephone. (Doc. 46 at 28.) Accordingly, all of the constitutional safeguards with which Defendant takes issue have been met in this case, and Defendant's assertions to the contrary are without merit.

## 2. Whether the Warrant Lacked Probable Cause

### a.  Parties' Arguments

Next, Defendant argues the search warrant for the apartment "should be suppressed because it is lacking in form, lacking in probable cause, and contains material misstatements of facts." (Doc. 30 at 1.) He alleges the affidavit upon which the magistrate granted the warrant lacked probable cause to believe contraband would be found inside the apartment. (Doc. 30-2 at 3.) He claims the only information upon which the warrant was granted was an allegation from an informant claiming that he observed methamphetamine in the apartment; a statement Defendant alleges is wholly uncorroborated. (Doc. 30-2 at 3.) Moreover, Defendant notes that detectives conducted surveillance on his apartment, but observed no activity that would corroborate the informant's allegation that he sold drugs out of his apartment. (Docs. 30-2 at 3; 57 at 6.) He attacks the Government's decision not to utilize the informant to make a controlled purchase or establish an undercover operation with law enforcement. (Doc. 30-2 at 3.)

Defendant also attacks the second paragraph of the affidavit which refers to "numerous tips and multiple Crime Stoppers tips suggesting that [Defendant] was a drug dealer[, because o]n its face, none of these allegations create a nexus with this particular apartment and drug trafficking." (Doc. 30-2 at 4; *see also* Doc. 57 at 7.) He alleges the warrant was based on a single Crime Stopper tip derived from second hand information, and thus the affidavit, which suggests LPSO received multiple tips, is disingenuous and deliberately misleading. (Docs. 30-2 at 4; 57 at 7, 12.) Additionally, he alleges the first three paragraphs of the warrant application, which purport to portray Defendant as a drug dealer, "are nothing more than conclusory statements derived from anonymous tips." (Doc. 30-2 at 4.) In light of the foregoing, Defendant claims that under the totality of the circumstances, there could not have been probable cause to justify the issuance of the warrant.

The Government maintains the warrant authorizing the search of the apartment was supported by probable cause, and in the alternative, that detectives acted in good faith in their execution of the warrant. (Doc. 33 at 2.) The Government notes that because the search was executed pursuant to a search warrant, Defendant bears the burden of establishing, by a preponderance of the evidence, that the search and resulting seizure of evidence were conducted in violation of his constitutional rights. (Doc. 33 at 3 (citing *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001)).) It maintains Defendant cannot succeed in carrying his burden of proof on the issue because the following support a finding of probable cause, as set forth in the warrant application: a proven, reliable confidential informant attested he witnessed a large quantity of methamphetamine, scales, and packaging material inside Defendant's apartment within 72 hours of Det. Erdey's application for the warrant; that the same informant witnessed Defendant selling drugs from within the apartment; and the informant had previously provided information that led to felony arrests and drug seizures, thereby establishing his reliability. (Doc. 33 at 4; Gov. Ex. 3; Def. Ex. A.) It asserts that under federal jurisprudence, this informant's tip, without more, is sufficient to establish probable cause. (Doc. 33 at 4 (citing *Mack v. City of Abilene*, 461 F.3d 547 (5th Cir. 2006); *United States v. Shanklin*, 196 Fed. Appx. 289, 290 (5th Cir. 2006) (per curiam)).) Additionally, the Government asserts that Detective Erdey did not intend to deceive the magistrate by writing Crime Stopper "tips" rather than a singular "tip"; this act was not done "intentionally or recklessly. At best, this was nothing more than an innocent grammatical mistake." (Doc. 58 at 3.)

Moreover, it claims several other informants, all of whom reported defendant sold methamphetamine from his residence, corroborated the informant's tip. (Doc. 33 at 5.) Additionally, detectives were able to confirm other information the tipsters provided, including

14

Defendant's residence and that he drove an Audi; this information, though unnecessary to establish probable cause, "lent further credence to the tip." (Doc. 33 at 5.) Based on the above, the Government asserts that under the totality of the circumstances, the magistrate had ample grounds to conclude probable cause supported the issuance of the warrant. (Doc. 33 at 5.) Additionally, the Government argues that Defendant's contention that Detective Erdey purposefully withheld exculpatory evidence from the warrant application "is unsupported by the record." (Doc. 58 at 3.)

In the alternative, the Government asserts that even if this Court finds there was insufficient information to establish probable cause, the exclusionary rule should not apply here because the detectives acted in good faith in their execution of the warrant. (Doc. 33 at 5.) It maintains the detectives' reliance on the warrant was reasonable, and application of the exclusionary rule in this case would run afoul of its intended purpose, i.e. to deter police misconduct. (Doc. 33 at 6.) With regard to Defendant's allegation of misstatements of material facts in the application for the search warrant and that detectives acted with reckless disregard for the truth, the Government asserts Defendant bears the burden of proof on the issue (a burden he has not met here). (Doc. 33 at 6 n.3.)

### b.  Analysis

As a general matter, "[p]robable cause exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of a crime." *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) (relying on *Gates*, 462 U.S. at 238–39; *Fountain v. City of Plano Police Dep't*, 4:12-CV-26, 2012 U.S. Dist. LEXIS 186196, at *19–20, 2012 WL 7149510, at *7 (E.D. Tex. Dec. 13, 2012)). "Assuming no problems exist with respect to time," an affidavit meets the bare minimum if it evidences a reasonable link between (1) the relevant criminal activity, (2) the things to be seized, and (3) the place to be searched. 2 WAYNE R.

LAFAVE, SEARCH & SEIZURE § 3.7(d) (5th ed. 2012-2015). With no more required than a reasonable connection between the evidence sought and the crime investigated, *see Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000) (finding an affidavit insufficient due to its failure to "identify a single fact that would suggest to a reasonable person that there was any link whatsoever" between the place to be searched and the crime committed), a court must apply the Fourth Amendment's requirement of probable cause "not according to a fixed and rigid formula, but rather in the light of the totality of the circumstances made known to the magistrate," *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S. Ct. 2085, 2085 (1984). Logically, therefore, what is later uncovered or proven true (or untrue) is irrelevant to this analysis and is an improper measure of probable cause. A magistrate's determination of probable cause "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (internal quotations omitted) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

A sufficient showing must, "obvious[ly]," be "a truthful showing." *Franks v. Delaware*, 438 U.S. 154, 164–65, 98 S. Ct. 2674, 2681 (1978) (emphasis in original) (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966)); *see also*, *e.g.*, *Winfrey v. San Jacinto Cnty.*, 481 Fed. App'x. 969, 979 (5th Cir. 2012) (quoting *Franks*). In this unique context, "truthful" does not mean "that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge," *Franks*, 438 U.S. at 165, or gleaned from other officers, *Bennett v. City of Grand Prairie*, 883 F.2d. 400, 407 (5th Cir. 1989). Instead, in setting forth his or her supporting facts, the affiant must not make "deliberately or recklessly false statements," *Curtis v. Anthony*, 710 F.3d 587, 597 (5th Cir. 2013) (explaining and applying *Winfrey*, 481 Fed. App'x. at 979), or omit "material" and "exculpatory" facts, *Kohler*, 470 F.3d at

16

1113. Consequently, allegations of "negligent misrepresentation" in the underlying affidavit will not render a warrant constitutionally infirm. *United States v. Astroff*, 578 F.2d 133, 136 (5th Cir. 1978), cited with approval in *Winfrey*, 481 Fed.Appx. at 980; *see also United States v. Williams*, 477 F.3d 554, 557–58 (8th Cir. 2007) (applying the same standard, derived from *Franks*). Equally undoubtedly, the mere "inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it." *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993); *see also United States v. Johnson*, 2:14-cr-12, 2014 U.S. Dist. LEXIS 143623, at *13, 2014 WL 5091970, at *5 (N.D. W. Va. Oct. 9, 2014) ("[W]hen inaccurate, improper, or otherwise tainted evidence is used to obtain a search warrant, the warrant will not be invalid so long as there is enough untainted information to support probable cause.").

Courts employ a two-step process to evaluate a defendant's motion to suppress when a search warrant is involved. First, the court must determine whether the *Leon* good faith exception to the exclusionary rule applies. *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999) (citing *United States v. Leon*, 468 U.S. 897 (1984)). If the good faith exception does not apply, then the court proceeds to the second step in the analysis and determines whether the warrant is supported by probable cause. *United States v. Froman*, 355 F.3d 882, 888 (5th Cir. 2004). If the good faith exception applies, however, the Court need not evaluate probable cause. *Id.*

The *Leon* good faith exception provides that evidence is admissible when it is obtained by law enforcement officials acting in objectively reasonable good faith reliance upon a search warrant, even if the affidavit on which the warrant was based was insufficient to establish probable cause. *See* 468 U.S. at 922–23; *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988). Due to the "strong preference for warrants," the issuance of a warrant by a magistrate "normally suffices to establish good faith on the part of law enforcement officers who conduct a search pursuant to the

17

warrant." *Leon*, 468 U.S. at 914, 922. However, an officer will not be able to claim objective good faith when, among other reasons: (1) the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; or (2) an officer relied on a warrant based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable. *United States v. Rojas-Alvarez*, 451 F.3d 320, 330 (5th Cir. 2006).

In this case, the warrant application stated that over the course of several months, LPSO's Narcotics Division had received "numerous complaints that a black male named Frank Demouchet (01/09/1984) AKA: "Jay" has been selling large amounts of methamphetamine [meth] within Livingston Parish. The complaints on Demouchet ranged from anonymous citizens calling in to Crime Stoppers tips." (Gov. Ex. 3; Def. Ex. A.) The affidavit further stated that within 72 hours preceding the application for the search warrant, Detective Erdey had received information from a "proven-reliable confidential informant (CI) that Demouchet had been selling meth from within the above mentioned residence. The CI has seen a large quantity of meth inside the residence in the past 72 hours. The CI has also observed scales and packaging materials consistent with distribution of meth." (Gov. Ex. 3; Def. Ex. A.) The affidavit further states that the CI provided detectives with information in the past which "led to felony arrests and the seizures of methamphetamine." (Gov. Ex. 3; Def. Ex. A.)

At the first hearing, Detective Erdey testified that LPSO received information from the Drug Enforcement Agency that a confidential informant reported that Defendant was distributing large amounts of methamphetamine in the Denham Springs area. (Doc. 46 at 6.) Around that time, LPSO received several anonymous phone calls that a black male known as "J" who drove a black Audi vehicle was delivering methamphetamine in Denham Springs, and one such tip provided a license

plate number which was registered to Defendant. (Doc. 46 at 6—7, 8.) Additionally, LPSO received information via a Crime Stopper's tip that corroborated the information provided by the confidential informant and the anonymous calls. (Doc. 46 at 7.) Detective Erdey testified at the second hearing that he began surveilling Defendant's apartment in November 2015, but in the course of his surveillance, he never observed Defendant engage in any drug transactions. (Doc. 53 at 23.) However, in Detective Erdey's opinion, the lack of firsthand observations of drug transactions does not equate to a lack of such activity. (Doc. 53 at 23.) The detectives did not conduct surveillance 24/7, and in any event, "sophisticated drug dealers" do not typically conduct drug transactions out in the open, they usually occur in confined spaces indoors and "where they can't be seen by the public." (Doc. 53 at 23.)

Based on the language of the warrant itself and Detective Erdey's testimony adduced at the hearings, it is clear the warrant was based upon probable cause. Although the warrant refers to Crime Stoppers "tips" rather than a singular "tip", this is not a "deliberately or recklessly false statement" that undermines the viability of the warrant, *see Anthony*, 710 F.3d at 597; it is, at worst, a "negligent misrepresentation" that does not render the warrant constitutionally infirm. *See Astroff*, 578 F.2d at 136. The warrant application and affidavit, which detail several corroborating tips provided by anonymous citizens, a confidential informant, and a Crime Stopper's tip, unmistakably evidence a reasonable link between (1) the relevant criminal activity, (2) the things to be seized, and (3) the place to be searched, and thus the warrant was based upon a sufficient showing of probable cause. *See* LAFAVE, SEARCH & SEIZURE § 3.7(d). Moreover, the fact the Crime Stopper's tip was based upon secondhand information does not render the warrant infirm, as probable cause may be based upon hearsay. *See Franks*, 438 U.S. at 165. Because the warrant application and affidavit provided "reasonably trustworthy facts… sufficient to lead a prudent

person to believe" that Defendant was storing narcotics in Apartment 128, the search warrant was based on probable cause, and Defendant's arguments to the contrary lack merit. *See Kohler*, 470 F.3d at 1109.

### 3. Constitutionality of the search of the Ford Taurus

#### a. Parties' Arguments

Defendant argues the search of the Ford Taurus exceeded the scope of the search warrant. (Doc. 57 at 7.) Although Defendant concedes the search warrant authorizes a search of "any vehicle", he suggests this cannot be read literally to apply to any and all vehicles because "not any vehicle is said to be used by [Defendant.]" (Doc. 30-2 at 7; *see also* Doc. 57 at 9.) Thus, according to Defendant, the warrant's authority to search "any vehicle" must be read in tandem with the vehicles associated with Defendant's drug trafficking and specifically identified in the affidavit by make, model, and license plate number; i.e., the Honda Accord and the Audi A5, but not the Ford Taurus. (Docs. 30-2 at 7; 57 at 9.) Moreover, Defendant argues his Taurus was beyond the purview of the warrant because the Ford vehicle referenced in the application for the search warrant was said not to have a license plate, while in fact, Defendant's Ford Taurus did bear a license plate. (Doc. 57 at 9.) Additionally, Defendant maintains that no independent grounds provided probable cause to justify a warrantless search of the Ford Taurus. (Doc. 57 at 9—10.) He argues that because the illicit nature of the package was not readily identifiable from the detectives' vantage (because it was concealed in a cellophane package), the fact the detectives observed Defendant place the package in the trunk cannot serve as the basis for probable cause to search the vehicle. (Doc. 57 at 10.)

The Government asserts three bases to justify the search of Defendant's Ford Taurus: the warrant authorized the search of the Ford; detectives acted in good faith; and there was, at a

minimum, reasonable suspicion for a stop and probable cause for a search of the vehicle. (Docs. 33 at 8; 56 at 7.) The Government notes that while the warrant itself did not expressly list the Ford as a place to be searched, the affidavit, which was incorporated into the warrant, did specifically list the Ford. (Docs. 33 at 8; 56 at 7.) This, according to Fifth Circuit jurisprudence, cured any defect in the warrant and provided sufficient particularity to withstand judicial scrutiny. (Docs. 33 at 8—9; 56 at 7 (*citing United States v. Hernandez*, 1256 Fed. App'x 624, 624 (5th Cir. 2005); *United States v. Beaumont*, 972 F.2d 553, 561 (5th Cir. 1992)).) Additionally, the Government notes "the warrant authorized the search of the 'aforesaid vehicles listed in the search warrant[,]'" and suggests that the warrant's failure to specify the specific vehicles to which it referred was simply a clerical error. (Doc. 33 at 9.) Thus, it maintains the detectives reasonably relied in good faith on the warrant to authorize a search of the vehicle, and therefore the exclusionary rule should not apply here (Doc. 33 at 9.)

Additionally, the Government argues that the rule permitting officers to detain individuals during the execution of a search warrant offers an independent and alternative basis to justify the search of the Ford Taurus. (Doc. 56 at 8.) Citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981), the Government argues detectives were "entitled to detain [D]efendant under the *Summers* rule because [he] was in the 'immediate vicinity of the [apartment].'" (Doc. 56 at 8.) The Government argues detectives needed to detain Defendant to ensure the warrant could be executed safely and efficiently and without placing the detectives in danger. (Doc. 56 at 8.)

Alternatively, the Government argues that even if the warrant did not authorize a search of the Ford, the detectives had reasonable suspicion (if not probable cause) for the stop based on the various tipsters and confidential informants that told detectives Defendant was selling drugs from his apartment; the detectives watched Defendant leave his apartment with a brown backpack, then

watched him peel back the carpet lining of the trunk of the car to reveal a hidden compartment in which he placed a cellophane-wrapped package.[5] (Docs. 33 at 8—9; 56 at 9—11.) Citing Supreme Court and Fifth Circuit jurisprudence, the Government asserts that based on the totality of the circumstances, they had reasonable suspicion to conduct a stop of the Ford. (Docs. 33 at 8—9; 56 at 9—10 (*citing Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 2014 (1999) (permitting officers to conduct warrantless search of vehicle if there is probable cause to believe contraband is located therein); *United States v. Montoya*, 556 Fed. App'x 299, 303, 304, 305 (5th Cir. 2014) (reasonable suspicion to stop vehicle after police learned the defendant was to receive a delivery of cocaine and then witnessed defendant meet the individual and exchange opaque bags with him).)

### b. Analysis

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396 (1979); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968). *United States v. Berry*, 15-30196, 2017 WL 7030331 (5th Cir. Dec. 1, 2016). *Terry* articulated a two-part test, which asks: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20); *see also*, *e.g.*, *United States v. Fajardo-Guevara*, 507 Fed. App'x 365, 366 (5th Cir. 2013)(per curiam) ("The legality of a traffic stop is examined under the two-pronged analysis described in *Terry*[.]); *United States v. Castro*, 480 Fed. App'x 782, 784 (5th Cir. 2012) (same). "For a traffic stop to be justified at its inception, an officer must have an objectively

---

[5] Detective Erdey testified that although he could not see the inside of the hidden compartment, he observed Defendant reach into it, place a package in it, and remove a different package from it. (Doc. 46 at 16—17.)

reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430.

In this case, it appears the search of the Taurus would likely be encompassed by the search warrant and underlying application incorporated by reference. However, the Court need not reach that issue because it is clear to the Court that under the totality of the circumstances, Detective Erdey had reasonable suspicion to effectuate a lawful *Terry* stop. Detective Erdey received credible information from various sources, including anonymous citizens, a confidential informant, and a Crime Stoppers tip, that Defendant was distributing narcotics in Livingston Parish. (Docs. 46 at 6—10; 56 at 3; Gov. Ex. 3; Def. Ex. A.) Pursuant to these tips, Detective Erdey launched an investigation into Defendant that included surveillance at Defendant's residence. (Doc. 46 at 10; Gov. Ex. 3; Def. Ex. A.) As the detectives conducted preliminary surveillance of Defendant's residence on the morning they were to execute the search warrant, they witnessed Defendant leave his apartment with two other men, approach a Ford Taurus, open the trunk, reach his hand inside so as to reveal the existence of a secret compartment under the carpet of the truck, place a satchel in the hidden compartment and remove a small cellophane-wrapped package from the trunk. (Docs. 33 at 2; 46 at 16—17.) Based on Detective Erdey's years of experience investigating narcotics crimes, he concluded this course of conduct was consistent with drug distribution.

Under the totality of the circumstances, this clearly created a reasonable suspicion that criminal activity was afoot, and justified the stop of the Taurus. *See Terry*, 392 U.S. at 30, 88 S.Ct. at 1884 (holding that a law enforcement officer may conduct a warrantless stop of an individual in a public place when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing

23

may be armed and presently dangerous"); *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010)

("'Reasonable suspicion [to conduct investigatory stop of vehicle] when the detaining officer can

point to specific and articulable facts that, when taken together with rational inferences from those

facts, reasonably warrant the… seizure.'" (quoting *United States v. Estrada*, 459 F.3d 627, 631

(5th Cir. 2006)).

The Court also finds Detective Erdey's subsequent search of the vehicle was "reasonably

related in scope to the circumstances that justified the stop in the first place[,]" so as to satisfy the

second prong under *Terry. See Lopez-Moreno*, 420 F.3d at 430. When the detectives stopped the

car and removed Defendant and his associates from within, they observed a strong odor of

marijuana emanating from inside the car. (Docs. 33 at 2; 46 at 20.) Under well-settled

jurisprudence from this Circuit, this alone created probable cause to search the vehicle. *See United

States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (detection of marijuana odor emanating from

vehicle provides law enforcement with probable cause to search vehicle); *United States v. Lork*,

132 Fed. App'x 34, 35-36 (5th Cir. 2005) (per curiam) (after conducting lawful traffic stop for

speeding, officer detected odor of marijuana emanating from defendant's vehicle, thereby creating

probable cause to search vehicle); *United States v. Henry*, 2015 WL 6479029 (M.D.La. 10/27/15)

(unpub'd) (deGravelles, J.) (officer detected marijuana odor emanating from car after lawful traffic

stop for minor traffic infraction; odor provided probable cause to search car) (citing *Reed*, 882

F.2d at 149; *United States v. Hahn*, 849 F.2d 932, 935 (5th Cir. 1988); *United States v. Sawyer*,

849 F.2d 938 (5th Cir. 1988)). Moreover, the stop was initiated to determine whether Defendant

was hiding illicit substances in the cellophane wrapped package, which Defendant hid in the

concealed compartment of the driver's side fender well. Thus, a search of the car (including the

trunk's hidden compartment) was certainly "reasonably related in scope" to the original purpose of the stop.

Based on the foregoing, the Court concludes Detective Erdey had reasonable suspicion to conduct a *Terry* stop of the Ford Taurus, and upon detecting the odor of marijuana, had probable cause to search the vehicle. Moreover, even if the Court concluded that the detectives did not have reasonable suspicion to stop the vehicle, application of the exclusionary rule would be improper here because the detectives' conduct was not "purposeful" or "flagrant", as they were acting in good faith. *See Utah v. Strieff*, 136 S.Ct. 2056, 2063 (2016) (holding application of exclusionary rule improper because no evidence suggested the officer's "illegal stop reflected flagrantly unlawful police misconduct.").

### 4.  Constitutionality of the search of the garage

#### a.  Parties' Arguments

Defendant argues the evidence recovered from the garage should be suppressed because the search warrant did not encompass it "nor [was] there sufficient probable cause within the warrant linking [the garage] to illicit activity that can be arguably and implicitly said to have been included within the application to search the apartment[,]" and no valid exception to the warrant requirement applies here. (Doc. 30 at 1.) Defendant acknowledges the "Reasons and Facts" section of the warrant application requests a search of "'any out building, shed, or garage affiliated with apartment 128,'" (Doc. 30-2 at 6 (quoting the warrant application)) but nonetheless alleges the search of the garage was beyond the scope of the warrant because "some of the document fails to establish any basis to believe that the apartment has a garage, much less any reason whatsoever to associate it with drug trafficking." (Doc. 30-2 at 6.) Further, Defendant argues, "the actual search warrant order excludes any reference to an associated garage or shed (Bates 38). In fact, police

would not know what, if any, storage unit was associated with the apartment until after they executed the search warrant." (Doc. 30-2 at 6 (emphasis original); *see also* Doc. 57 at 7.) He insists there were no exigent circumstances and no independent bases for establishing probable cause to search the garage, and therefore the methamphetamine and cocaine must be suppressed. (Doc. 30-2 at 6—7.) Moreover, Defendant argues the warrant's reference to "curtilage" cannot justify the search of the garage because by the warrant's plain language, it only authorizes a "search of people found within it" but not structures on the curtilage. (Doc. 57 at 8 (citing Gov. Ex. 1).)[6]

The Government offered three justifications for the search of the garage: (1) the warrant authorized the search; (2) the garage fell within the apartment's curtilage; and (3) the detectives acted in good faith. (Docs. 33 at 6; 56 at 5—7.) The Government cites *United States v. Olinde*, 2006 WL 1049048 (5th Cir. 2006)(unpub'd), a case in which the Fifth Circuit struck down the defendant's challenge of the search of a shed on the basis that neither the warrant nor its supporting affidavit specifically mentioned it. (Doc. 33 at 6 (citing *Olinde*, 2006 WL 1049048 at *3—*4).) The court nevertheless upheld the search because the warrant authorized a search of the "premises" at the address listed in the warrant. (Doc. 33 at 6.) The Government argues the warrant *Olinde* is analogous to the warrant in the instant case because here, the warrant "specifically authorized the search for evidence 'on or in a property located at' 11000 Buddy Ellis Road. That language was broad enough to encompass the garage associated with the apartment considering that an addendum to defendant's lease specified that the garage was part of the property at 11000 Buddy Ellis Road #128." (Doc. 33 at 7.)

---

[6] In his brief, Defendant cites Gov. Ex. 1 in support of this assertion. However, the Court presumes this was in error and Defendant actually intended to cite the search warrant, which is Gov. Ex. 3; Def. Ex. 1.

Alternatively, the Government argues the garage fell within the curtilage of the apartment, and pursuant to *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139 (1987) and its progeny,[7] the warrant authorizes a search of the curtilage surrounding the home. (Doc. 33 at 7.) Although the residence in the instant case was an apartment, and not all areas in the apartment building will be considered curtilage because of their shared and public nature, it argues the garage in this case should be considered curtilage because it was solely Defendant who had access to and control of the garage. (Doc. 33 at 7—8.) Finally, the Government asserts "[t]he evidence found in the garage should not be suppressed for the additional and alternative reason that detectives acted in good faith," and were reasonable in their determination the warrant encompassed the garage. (Doc. 33 at 8; *see also* Doc. 56 at 6.) Accordingly, because detectives' actions were in good faith and were not "flagrant, reckless, or grossly negligent," application of the exclusionary rule to suppress the narcotics found within the garage would be inappropriate in this case. (Doc. 56 at 6.) Moreover, the Government notes that detectives acted prudently when they contacted the assistant district attorney to ensure the warrant provided authority to search the garage, thus they clearly did not engage in the type of conduct which the exclusionary rule seeks to prevent. (Doc. 56 at 6—7.)

### b. Analysis

"[P]ractical accuracy rather than the technical precision governs in determining whether a search warrant adequately describes the premises to be searched." *United States v. Williams*, 687 F.2d 290, 292 (9th Cir.1982) (quoting *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745 (1965)). Search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590 (1969); *Ventresca*, 380 U.S. at 108–109, 85 S.Ct. at 745–746. For example, warrants

---

[7] *See e.g., United States v. Kellogg*, 2013 WL 3991956 (N.D. Ga. 2013) (upholding search of shed on curtilage despite the warrant not expressly listing the shed as area to be searched).

authorizing a search of "premises" at a certain address authorize a search of the buildings standing on that land. *Williams*, 687 F.2d at 293; *United States v. Meyer*, 417 F.2d 1020, 1023 (8th Cir. 1969). Thus, the physical description would "not limit the scope of the search to those specific areas, but instead [made] the premises to be searched more readily identifiable." *United States v. Griffin*, 827 F.2d 1108, 1115 (7th Cir.1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085 (1988). If "the warrant state[s] the physical address of the premises and [gives] a description of the residence[,] ... [t]he detached ... shed ... [is] the type of building[ ] [that is] ordinarily a part of residential property." *United States v. Earls*, 42 F.3d 1321, 1327 (10th Cir.1994), *cert. denied*, 514 U.S. 1085, 115 S.Ct. 1800 (1995).

As the Government correctly argues, *United States v. Olinde*, 2006 WL 1049048 (5th Cir. April 20, 2006) (per curiam) (unpub'd) is factually similar to the instant case. In *Olinde*, officers relied on a search warrant of Defendant's premises to conduct a search of a shed on Defendant's property (which included a mobile home and a shed approximately ten feet away from the home, attached to the house by a power cord), notwithstanding the warrant did not expressly include the shed. *Olinde*, 2006 WL 1049048 at *3—*4. Relying on similar jurisprudence as described in the preceding paragraph, the *Olinde* court concluded the good faith exception applied because the agent who requested and executed the warrant asked in his application "to search the 'property present on the premises' located at [the defendant's] address." *Id.* at *4. Consequently, the court found it reasonable for the detective to believe the warrant encompassed all the property at the address, including the shed. *Id.*

The Court holds that the detectives acted in good faith in interpreting the warrant to include a search of the garage. The warrant application Detective Erdey drafted reflects that he requested "that any outbuilding, shed or garage affiliated with Apt. 128 be subject to search." (Gov. Ex. 3;

28

Def. Ex. A.) The warrant itself authorized a search of "a property located at 11000 Buddy Ellis Rd Building-1, Apt 128[,] Denham Springs, LA 70726[.] (Gov. Ex. 3; Def. Ex. A.) The magistrate specifically referenced the affidavit in the search warrant. (Gov. Ex. 3; Def. Ex. A.) At the first hearing, Detective Erdey testified that he believed the search warrant authorized him to search "the apartment, any out-buildings, persons, [and] garages affiliated with Apartment 128." (Doc. 46 at 12—13.) According to Detective Erdey's testimony, it was not until he executed the return of the search warrant that he realized the warrant did not specifically mention the garage. (Doc. 46 at 13.) Additionally, he testified that prior to the execution of the warrant, detectives had knowledge that Defendant had a garage, but did not know specifically which garage was leased to Defendant until after the execution. (Doc. 46 at 23.) He further testified the reason detectives were unable to identify specifically which garage was associated with Defendant's apartment is because they suspected someone in the apartment's management was providing Defendant information that law enforcement officials were watching him and his apartment. (Doc. 46 at 23.)

Based on the foregoing, under the totality of the circumstances, the Court finds that the "common sense" interpretation of a warrant that authorizes a search of "evidence 'on or in a property located at' 11000 Buddy Ellis Road" could reasonably be read to include the garage leased to Defendant with the lease of Apartment 128. Further, the Court finds that detectives acted in good faith in relying on the warrant to search the garage. Therefore application of the exclusionary rule to suppress the evidence found in the garage is improper in this case.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's **Motion to Suppress** (Doc. 30) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>December 16, 2016</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**